HIP SING ASSOCIATION, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hip Sing Asso. v. Commissioner
Docket No. 12653-77.
United States Tax Court
T.C. Memo 1982-203; 1982 Tax Ct. Memo LEXIS 544; 43 T.C.M. (CCH) 1092; T.C.M. (RIA) 82203; April 15, 1982. *546 Murray Appleman, for the petitioner. Joan Ronder Domike, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge:* Respondent determined deficiencies in petitioner's Federal income tax and additions to tax for the years and in the amounts set forth: Additions to the Tax
Taxable Year Ended
Tax § 6651(a)(1) [1] § 6651(a)(2)
December 31, 1970
$ 58,855.25
$ 13,242.43
$ 14,713.81
December 31, 1971
48,448.70
10,900.96
12,112.18
December 31, 1972
77,713.88
17,485.62
19,428.47
December 31, 1973
30,879.71
6,947.93
7,719.93
Additions to the Tax
Taxable Year Ended
Tax § 6653(a) § 6655(a)
December 31, 1970
$ 58,855.25
$ 2,942.76
$ 1,547.31
December 31, 1971
48,448.70
2,422.44
1,245.52
December 31, 1972
77,713.88
3,885.69
2,094.20
December 31, 1973
30,879.71
1,543.99
767.92
*547 Respondent has conceded that petitioner is not liable for additions to tax pursuant to section 6651(a)(2). The principal issue for decision is whether or not for the years involved petitioner was exempt from Federal income tax under section 501(c). If petitioner were not exempt in any of these years, then the amounts of its gross income and deductions must be determined as well as its liability for additions to tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by reference. Petitioner Hip Sing Association, Inc., was incorporated under the laws of the State of New York in 1896 under the name "Hep Sing Tong" as a nonprofit "membership" corporation. Its objects as stated in the certificate of incorporation were as follows: To establish and maintain a permanent place of meeting of the members, away from the baneful influences of the opium den and gambling joint; where religious observances, social amusements, recreations and intercourse may be enjoyed; and the study of the English language may be pursued, thereby fitting those members for occupations *548 as interpreters and otherwise, and To further the suppression through lawful means, of gambling, policy selling, vice and immorality generally among the Chinese of the City of New York and Brooklyn, and such other places, as the corporation, through its directors, may hereafter decide to add; and to prosecute in the Courts of law, through the proper authorities, such violations of the laws relating to order and morality; as may, from time to time, come to its notice; and in general to raise the tone of the resident Chinese. In 1951, the name of the corporation was changed to its present name and its objects were restated as follows: (a) To establish and maintain a permanent place of meeting of the members, where religious observances, social amusements and recreations may be enjoyed and the study of the English language pursued, thereby fitting these members for occupations in American society and preparing those eligible therefor for United States citizenship. (b) To improve the morality and civic consciousness of Chinese and Chinese-Americans in and about the City of New York and such other cities as the Corporation may hereafter decide to establish itself or its subsidiaries, *549 and to sponsor, voluntarily aid and in general voluntarily carry out activities beneficial to the Chinese community in and about the City of New York and other places, within such limitations as are provided by law. (c) To acquire, by purchase, lease or otherwise, upon such terms and conditions and in such manner as the Board of Directors of the Corporation shall determine or agree to, and only for the purpose of carrying out the purposes of this Membership Corporation, and to the extent to which the same may be allowed by law, all or any part of the property, real and personal, tangible or intangible, of any nature whatsoever, and to pay for the same in cash, stocks, bonds or other securities or partly in cash and partly in such stocks, bonds or other securities, or in such other manner as may be agreed, and to hold, possess and improve such properties, and to assume in connection with the acquisition of any such property any liabilities of any such corporation, person, firm or association, provided said activities are not carried on for profit but solely for the purpose of carrying out the purposes of this Membership Corporation. Petitioner was formed by and is composed largely *550 of members of the Chinese race. Its purpose was and continues to be to act as a vehicle for intercourse among members of that race in New York City and to assist petitioner's members in becoming better citizens.The first such organization was formed in San Francisco some 120 years ago. Today there are 18 to 20 Hip Sing associations in various cities throughout the country, with a national organization headquartered in New York City. The national organization is not a corporation but is a loose federation of the individual Hip Sing associations, each of which appears to be substantially autonomous. The national organization was created by the various Hip Sing associations some years prior to the tax years here involved. Each of the individual Hip Sing associations is a part of the national organization, which is governed by representatives designated or elected by the various member associations, including petitioner. The members of the associations use a secret sign to identify themselves to each other and directories are available which list officers of the national and of the member associations in the various cities. There appears to be a substantial amount of intercourse *551 between the member associations, both directly as well as through national conventions.
Petitioner owns a building in New York City, the first two floors of which are rented to unrelated organizations. The third floor is used for petitioner's office and the fourth floor also houses a shrine dedicated to an ancient Chinese general where the members periodically worship. The shrine has a perpetual light, incense and other ritualistic symbols typical of Chinese shrines. There are no eating or drinking facilities on the two floors of the building occupied by petitioner. Petitioner and the national Hip Sing organization operate informally, and largely in accordance with Chinese customs and practices. Petitioner's books and records are kept in Chinese and their accounts do not fit well into the terminology of domestic membership organizations, due to the fact that petitioner operates in accordance with Chinese customs. Petitioner has no written bylaws. The membership of petitioner meets approximately once a month, with 70 to 80 members generally attending. There are no prescribed dues but individual members, as they are able, contribute funds to petitioner to pay for operating *552 expenses and on occasion for other purposes. Funds received from members apparently fall into three general categories: association expenses, escrow for members and special contributions. The expense category is subdivided into two subcategories, funds for general operation and amounts to defray costs of conventions or meetings of the national organization. Funds in the escrow account are contributed by older members who are fearful that their money will not be taken care of when they die. To avoid that, money may be transferred to petitioner with directions to hold it for the individual, to return it if requested, or on death of the person to remit it to the individual's next of kin in China. The special contributions are donated by members to take care of other members who are sick or needy or to pay for burial of indigent members. Petitioner also receives rent from the tenants of the first two floors and small sums of money are from time to time received from non-members and from out-of-state members. There is no evidence in the record which in any respect indicates that petitioner during the period involved or any other time has ever engaged in any improper or illegal activities *553 or any other activity unrelated to petitioner's purposes. All of petitioner's funds in excess of its operating expenses are used or set aside for furtherance of petitioner's purposes. These purposes apparently include the loaning of funds to the other Hip Sing associations and, of course, contributing to projects of the national organization, such as that described below. Some of the petitioner's problems with the Internal Revenue Service appear to have been derived as a result of attempts to comply with Government requests for information. In at least some instances, petitioner has responded to audit inquiries with the assistance of attorneys lacking a full understanding of petitioner's organization and method of operation. Efforts were made to fit petitioner into a conventional mold by using customary terminology and concepts rather than by translating correctly the relatively scarce books and records maintained by petitioner. At least through the year 1973, petitioner has not filed any income tax returns and petitioner did not undertake to establish its status with the Internal Revenue Service as an exempt organization until requested to do so by the IRS sometime during *554 1973. Petitioner's case has been somewhat complicated by evidence as to a corporation under the name Hip Wah Hing Realty Corporation. In 1968, apparently at the insistence of some of petitioner's members [2] this corporation was organized to acquire one or more buildings which when fully paid for would be given to the national Hip Sing organization to be used as residences for needy Hip Sing members. It is a fact, although irrelevant here, that the individuals charged with management of this corporation probably did not understand and certainly did not comply with the mechanisms of American corporate law. No stock was issued and apparently no effort was made to implement the organization of the corporation. Ultimately, these individuals undertook to acquire the necessary funds for the purchase of the buildings through the use of a Chinese custom referred to as the "Hundred Sons Club." Through this mechanism funds were "loaned" without interest and without any clear repayment obligation to this corporation, or perhaps to the group of Hip Sing members responsible for this project, sometimes referred to in the record as "trustees," for the purchase of the real property. Some of *555 the funds came from petitioner; other funds came from Hip Sing organizations in other cities. Some "loans" were repaid in whole or in part during the years involved. These circumstances further illustrate that petitioner and presumably the affiliated organizations operated in accordance with Chinese customs and practices, for the benefit of the members of this ethnic group throughout the country, but without much understanding of the niceties of State corporation and Federal tax laws.
OPINION The first issue for decision is the status of petitioner under section 501(c).At various points during this proceeding, petitioner has claimed to be exempt as a social welfare organization (section 501(c)(4)), as a social club (section 501(c)(7)), as a fraternal beneficiary association providing for payment of benefits to members (section 501(c)(8)), or as a fraternal beneficiary association which does not provide benefits to members (section 501(c)(10)). Qualification of petitioner *556 as an exempt fraternal beneficiary society under either section 501(c)(8) or section 501(c)(10) will be dispositive of this case.Since we conclude that petitioner qualifies as a domestic fraternal association operating under the lodge system as defined in section 501(c)(10), claims under the other subsections of section 501(c) need not be discussed. Fraternal beneficiary societies, orders or associations have been exempt from Federal taxation from time immemorial. The present language of section 501(c)(8) is almost identical to the exemption from premium tax, provided by section 11(a) of Title 1 of the Revenue Act of 1916, 39 Stat. 766, of insurance policies issued by fraternal beneficiary organizations operating under the lodge system and providing for the payment of benefits to members or to their dependents. Regulations almost identical to section 1.501(c)(8)-1(a), Income Tax Regs., have been in effect since 1918. This Court in Philadelphia & Reading Relief Association v. Commissioner,4 B.T.A. 713, 725-726 (1926), adopted the definition *557 of a "fraternal beneficiary association" set forth in the case of National Union v. Marlow,74 F. 775 (8th Cir. 1896). The Eighth Circuit described such an association as one whose members have "banded themselves together as an association or society to aid and assist one another, and to promote the common cause." 74 F. at 778. In general, fraternal beneficiary associations were found by the Eighth Circuit to have been formed to promote the welfare of the members of the association and their families and to advance their interests in other ways. The work of such associations is of a beneficial and fraternal character because the organization aims "to improve the condition of a class of persons who are engaged in a common pursuit, and to unite them by a stronger bond of sympathy and interest." National Union v. Marlow,supra at 779.
Petitioner has clearly shown that it was organized by individuals with a common ethnic background to assist one another and to improve in general the social, moral and intellectual welfare of its members. That *558 general purpose has continued through the years here involved. It has a shrine with a perpetual light, incense and other indicia of a religious ritual. All members are secret identification signs which further the common bond of petitioner's members with members of other Hip Sing associations. It seems reasonably clear that petitioner is a fraternal beneficiary association as defined in National Union v. Marlow,supra, and Philadelphia & Reading Relief Association v. Commissioner,supra.Moreover, several witnesses described petitioner as a "fraternal" organization without challenge from respondent.
Sections 501(c)(8) and 501(c)(10) each describe fraternal beneficiary associations operating under the lodge system.The material difference between the two sections is that the former requires the entity to provide life, sick, accident or other benefits to its members or their dependents whereas there is no such requirement in the latter. While petitioner appears to be a conduit for some benefits for destitute members, this activity does not rise to the statutory requirement in section 501(c)(8) of providing "life, sick, accident, or *559 other benefits to the members." Polish Army Veterans Post 147 v. Commissioner,24 T.C. 891 (1955). Therefore, petitioner can qualify as a fraternal beneficiary association only under section 501(c)(10). [3]
Leaving aside for the moment the meaning of the phrase "operating under the lodge system," petitioner appears to meet the other statutory requirements. Its net earnings are devoted to charitable, educational and fraternal purposes. It does not itself provide life, sick, accident or similar benefits. And it is, as we have concluded, a fraternal beneficiary association. The more difficult question is whether during the years 1970 through 1973 petitioner was "operating under the lodge system." In one *560 of the few cases which has considered the identical language of the 1916 Act, the District Court for the Eastern District of Missouri defined the term "lodge system" in the following language: By the "lodge system" is generally understood an organization which holds regular meetings at a designated place, adopts a representative form of government, and performs its work according to a ritual. That does not seem to be a very harsh definition of what is usually understood as the lodge system and is not so strict in its requirements as the definitions often stated in the statute books. [Western Funeral Benefit Ass'n v. Hellmich,2 F.2d 367, 369 (E.D. Mo. 1924.] The facts demonstrate compliance with the requirements of this case. Petitioner holds regular meetings at its New York City headquarters.It has a representative form of government, i.e., its officers are elected by the membership. And its shrine and religious ceremonies play a large part in its activities. Thus, it meets the ritual test. Under the case law, petitioner would be considered to be a domestic fraternal *561 association operating under the lodge system. Thus, petitioner appears to meet the statutory requirements of section 501(c)(10). Respondent's regulations, however, expand upon the judicial interpretation of "operating under the lodge system." Section 1.501(c)(8)-1(a), Income Tax Regs, [4] provides in part as follows: "Operating under the lodge system" means carrying on its activities under a form of organization that comprises local branches, chartered by a parent organization and largely self-governing, called lodges, chapters, or the like. * * * In Fraternal Order of Civitans of America v. Commissioner,19 T.C. 240 (1952), *562 we held that a single organization, "the only organization of its kind in existence" could not be said to be operating under the lodge system. That case involved the original Civitan organization which had not until 1946, the latest year then before this Court, decided to create a parent lodge and subordinate lodges. Apparently the first subordinate lodge was organized during the latter part of 1946 by the petitioner in that case. Accordingly, we said that: The petitioner during the taxable years, at least until some time in the latter part of 1946, was not "operating under the lodge system" as that phrase is defined in the regulations in that the petitioner was the only organization of its kind in existence and the record does not show that there was any "parent organization" separate from the petitioner. * * * [19 T.C. at 244.] However, we were not required to focus on that part of the language of the regulations which, taken literally, requires that the local branches or lodges be "chartered by a parent organization." Thus, the narrow issue before the Court in this case is whether or not petitioner fails of qualification under section 501(c)(10) by reason *563 of the fact that neither it nor its affiliated lodges appear literally to constitute "local branches, chartered by a parent organization." We have found that under the applicable case law, petitioner is operating under the lodge system. This suggests the possibility that the regulation in requiring a charter from a national organization may have gone too far. However, there is nothing explicit in either the statute or the language of this regulation which requires that the parent organization be created first and then for the parent to create the subordinate organizations. Logic would dictate that qualification under the statute should not be affected by whether the subordinate organizations form the national or the converse. Here, all the local Hip Sing associations appear to have been formed as offshoots of the original San Francisco Tong, presumably as its members moved from San Francisco to other cities. When the various local associations banded together formally to create a national organization, they created their own parent in the sense that a central organization must be considered to be in a position to support and give direction to its constituents. The regulation *564 recognizes that as here, the constituent organizations may be "largely self-governing." With the creation of the national or central Hip Sing entity, each of the then existing local associations, including petitioner, must be deemed to have been simultaneously "chartered by the parent they created." Certainly, they were the "charter members" of the national. We conclude, therefore, that petitioner is "operating under the lodge system" within the meaning of the Code and the applicable regulations. In all respects during these years, it qualifies as a domestic fraternal association as described in section 501(c)(10), and it is, therefore, exempt from tax. See Rev. Rul. 77-258, 1977-2 C.B. 195, and Rev. Rul. 76-457, 1976-2 C.B. 155. Decision will be entered for the petitioner.
Footnotes
*. This case was tried before Judge Cynthia H. Hall, who has resigned from the Court. By order of the Chief Judge, dated January 13, 1982, the case was reassigned to Judge Meade Whitaker↩ for disposition.
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. It is unclear from the record whether these individuals were acting on behalf of petitioner or on behalf of the national association, although the latter appears to be the more logical assumption.↩
3. Section 501(c)(10) reads as follows: (10) Domestic fraternal societies, orders, or associations, operating under the lodge system-- (A) the net earnings of which are devoted exclusively to religious, charitable, scientific, literary, educational, and fraternal purposes, and (B) which do not provide for the payment of life, sick, accident, or other benefits.↩
4. The regulations under subsection 501(c)(10) incorporate by reference the requirements of section 501(c)(8) except as to the payment of benefits. In Fraternal Order of Civitans of America v. Commissioner,19 T.C. 240↩ (1952), we commented as to identical language in the then existing regulations that they should have the force of law since at that time similar regulation language had been in effect since 1918.